NEWTON (BEALL v.). See Case No. 1,164

NEWTON (CAMMEYER v.). See Cases Nos. 2,344 and 2,345.

---

## Case No. 10,189.

### NEWTON et al. v. CARBERY.

[5 Cranch, C. C. 626.] [1]

Circuit Court, District of Columbia. March Term, 1840.

WILLS — UNDUE INFLUENCE — SOUNDNESS OF MIND OF TESTATOR — EVIDENCE — APPEAL FROM ORPHANS' COURT — VALIDITY OF LEGACY.

1. The court, in forming its opinion as to the soundness of mind of a testator, will look rather to the facts upon which the witnesses may have

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William Cranch, Chief Judge.]

formed their opinions. than to the opinions themselves, but will form its opinion from the whole evidence, consisting of facts and opinions.

2. The influence which will set aside a will must be undue influence. The influence of the general doctrines of the church, of which the testator was a member. is not such undue influence; nor can the holding of such doctrines be adjudged to be such delusion as will vacate the will. The court has no jurisdiction to decide whether a doctrine held by any particular religious sect will not avoid the will.

3. Upon an appeal from the sentence of the orphans' court, sustaining a will, this court has no jurisdiction to inquire into the validity of any particular legacy bequeathed by the will.

Appeal from the sentence of the orphans' court for the county of Washington, which overruled a caveat, and admitted the will to probate.

On the 12th of February, 1839, the appellants filed, in the orphans' court, a caveat against the will of Eloysa Mattingly, which was, on that day, offered for probate, by the appellee, Lewis Carbery, who is named therein as sole executor. The will was dated on the 17th of December, 1838.

The caveat states that the appellants are the next of kin and legal heirs and representatives of the deceased, and are entitled to all her estate, real and personal, and to administration of her personal estate; and they object to the probate of the will: (1) because the supposed testratrix was not "of sound and disposing mind, and capable of executing a valid deed or contract." (2) That she made it under undue influence operating upon her mind; and that it was not her own free will and consent. (3) That the bequests and devises therein named, or many of them, cannot be carried into effect, and are null and void.

By the will, the testatrix bequeathes small legacies, varying from five to fifty dollars, to eleven of her relations, including the appellants; she then bequeathes to the Rev. William McSherry, president of the Georgetown College, $100, to be distributed equally among the clergy of the said college for the purpose of having masses offered up for the repose of her soul. She then makes the following bequests, namely: Her sideboard to the Rev. Mr. Lucas, pastor of Trinity church, for the use of the said church. To the pastor of the Catholic church at Newtown, in St. Mary's county, ten dollars, one-half to go to the poor of that congregation and the other for masses for her soul. She then gives ten dollars each to the archbishop of Baltimore; Bishop Fenwick of Boston; to the pastors of Trinity church in Georgetown, (where she resided and died;) to the Rev. S. L. Dubuisson, and eighteen other priests and societies, &c. On the 15th of February, 1839, the appellee appeared and denied the allegations of the caveat, and asserted the validity of the will: to which the appellants replied, affirming their allegations, and joining issue upon the facts, and praying the orphans' court to decide the same; where-

upon, the court proceeded to take the depositions of the witnesses; and thereupon sustained the will, and admitted it to probate; from which sentence the caveators appealed to this court.

W. L. Brent, for appellants, cited the testamentary law of Maryland of 1798, c. 101, Subc. 1, § 3; the book called "Principles of the Roman Catholic Religion," pp. 43, 44, 184; Dorsey, Test. Law, 45, note, and p. 142; Davis v. Calvert, 5 Gill & J. 269; Huguenin v. Baseley, 14 Ves. 287, 288; Hale v. Hills, 8 Conn. 39; 6 Wheeler, 526, 527; Norton v. Relly, 2 Eden, 286; Ridgeway v. Darwin, 8 Ves. 66, 67; Ex parte Cranmer, 12 Ves. 450–452; Barker's Case, 2 Johns. Ch. 232; Mary Morris' Will, [Griffiths v. Robins], 3 Madd. 192; 2 Bl. Comm. (Chitty's note) 497; 3 Starkie, Ev. 1702, note 1, 708; Swinb. Wills, pt. 2, § 5; Clark v. Fisher, 1 Paige, 171; 2 Har. Dig. p. 587; the book called "True Piety," pp. 179, 181, § 12; Id. p. 182, § 6; Id. p. 184, § 8, art. 5; Id. p. 186, § 10.

Mr. Bradley, contra, cited Harrison's Case, 2 Phillimore, Ecc. 291, 292, 294, 320, 326, 329, 340; Morice's Will, 5 Ecc. 211, 223; Davison v. Rowan [Case No. 6,141]; Stevens v. Vancleve [Id. 13,412]; also a sermon by —— in London, that the priests have no power to relieve from purgatory; Prin. Rom. Cath. Religion, p. 284, art. 5; Id., p. 184, art. 2, 5; Dorsey, Test. Law, 46; Crampton's Case.

CRANCH, Chief Judge. 1. Upon the first point, the soundness of mind of the testatrix, the opinions of the witnesses differed very much, according to the side on which they were produced. But there is nothing strange in this. In forming opinions, the mind is insensibly biased by its passions and prejudices, its interests and its associations. The influence of the interest of a friend, or of the society of which the witness is a member, are almost as strong as original self interest; and it is more insidious, because we are not so careful to guard against it, inasmuch as it bears the semblance of a virtue. An opinion, also, has less weight than a fact, as it can seldom be the subject of a prosecution for perjury. In forming an ultimate opinion, therefore, upon the question of soundness of mind of the testatrix, the court must look rather to the facts upon which the various opinions of the witnesses are formed, than to the opinions themselves. The fact that the witness formed the opinion from the facts stated, is itself a fact proper for the consideration of the court, as evincing the sincerity of the opinion; but the court must form its opinion from the whole evidence, consisting of facts and opinions.

The testimony is voluminous, and more contradictory as to opinions than as to facts. It appears from the evidence, that the testatrix was old, and singular in her manners and dress; penurious and miserly; and a religious devotee of the Roman Catholic

Church; that she had always managed her own affairs, and particularly her money matters herself, with much worldly prudence; lending her money and receiving the interest with great punctuality, until three or four days before making her will, when she gave a power of attorney to Mr. Carbery to transact her business, and afterwards appointed him her executor. That she was eighty-seven years old, and her mind, perhaps, in some degree enfeebled by age, and by her disease, which was dropsy in the chest; a disease not directly affecting the intellect. That she had, ten years before, made a will containing a similar disposition of her estate, and bequeathing the residue to charitable purposes, after the payment of small legacies to her relatives, and to certain priests, but omitted to dispose of the residue, which was the principal part of her estate. It was this will which she desired to alter, and which she revoked by the present will. The principal facts relied upon to prove her insanity are—First, that she was very old; second, had many peculiarities, and was very singular in her manners and appearance; third, that her mind seemed to dwell upon her riches, and money affairs, and she often spoke of them; fourth, that she was a woman of strong passions and prejudices; fifth, that she changed her mind often in respect to her will; sixth, that she was penurious, and refused to buy medicine for a colored child, whose mother she had hired out; seventh, that she was very suspicious of her servants, and some of her relatives; eighth, that she did not take her medicine regularly, sometimes taking it too often, sometimes not often enough, and some times not at all; ninth, that she was quarrelsome about trifles; tenth, that she often denied herself the necessaries of life, and wore very mean and sordid clothes, (although she had property enough,) and said she was afraid she would come to want; eleventh, that she did not buy sufficient provisions for her servants; twelfth, that she said that in the preceding summer, she buried eight hundred or one thousand dollars of bank-notes in the earth, which got so wet that "it took two or three days to spread it over her bed and dry it." The testimony, on both sides, clearly shows that the testatrix was extremely penurious and miserly; that her ruling passion was the acquisition of wealth; and it is very apparent that the peculiarities in her manners, appearance, and dress, her denial of the necessaries of life for herself and her servants; her suspicious and quarrelsome disposition, may all be traced to that source, and are evidence of that ruling passion only; not of mental insanity. The story of her having buried bank-notes in the earth, if true, may, perhaps, be accounted for by the same ruling passion; but the absurdity of the act, which would make it evidence of insanity, discredits the fact itself. It is not probable that she did the act; or, if she did, it might

have been upon some sudden alarm, or fear, and as a temporary expedient. The witness, who relates her conversation upon that subject, does not state what reason she gave, if any, for an act of such apparent folly. The fact is not corroborated by any other evidence; and the fact stated as part of the story, that "it took two or three days to spread it over her bed and dry it," seems quite as improbable as the fact of burying it in the garden. The fact that she altered her will several times, is not, of itself, evidence of insanity; on the contrary, the consistency of the several wills with each other, as to the general plan of disposition of her property, shows that the subject occupied much of her thoughts for many years, and that her mind was in a sound, disposing state. The will next preceding the last was imperfect, and would have left her intestate as to the bulk of her estate. That she wished to change it, is, therefore, no evidence of intellectual insanity. But it is said that she was a woman of strong passions and prejudices, and, therefore, she was not competent to make a valid disposition of her estate. It is true that our passions and prejudices are apt to warp our judgment; but they enter into our daily transactions, more or less, and mingle with our motives; and it is impossible to draw the line beyond which they produce mental insanity. The existence of such passions and prejudices is not, of itself, evidence of such insanity.

These observations, we think, apply to all the facts which the witnesses against the will have adduced as the foundation of their opinions; and, without resorting to the opposite testimony, we think the facts not sufficient to justify the opinion expressed. They do not, in our judgment, show a prima facie case of testamentary incapacity; but, if they did, they are greatly outweighed by the facts stated by the witnesses in favor of the will, showing that she had, ten years before, made a will containing a similar disposition of the principal part of her estate; that she had continued to manage her affairs with prudence and great economy; that she had lent out her money, demanded and received the interest with punctuality; taken the securities; hired out her own servants, and received their wages; and provided for the wants of her family; and that in these transactions she evinced great acuteness of mind; that this state of mind continued quite up to the 17th of December, the date of the will; and that when she executed it she declared, in the presence of the subscribing witnesses, that she had read every word of it, and that it was just as she wished. If the case were to be decided by the opinions of the witnesses, we think those in favor of the will greatly preponderate; without considering that of Mr. Lucas, of whose legal competency we doubt, notwithstanding the instrument of writing executed by him as a renunciation or release of his interest under the will. We

are, therefore, of opinion, that at the time of making this will, the testatrix was of sound and disposing mind, and capable of executing a valid deed or contract.

2. The second objection to the will is, that it was made by the testatrix under undue influence operating upon her mind; and under mental delusion. There is no evidence in this cause, of any influence whatever, exercised over the testatrix, by any person, in relation to this will, other than the influence of the general doctrines of the church of which she was a member, as they were inculcated by the priests. It was contended that the testatrix bequeathed the greater part of her estate to the church, and the orphan asylum connected with the church, under a belief that by thus giving her property she would be entitled to the prayers of the church, which would relieve her from the pains of purgatory. That this was not an article of faith of the church, but a doctrine inculcated by the priests, and founded upon the following clause of the prayers for the church (in page 44 of the book called "True Piety"): "Finally, we pray thee, O Lord of Mercy, to remember the souls of thy servants departed, who are gone before us, with the sign of faith, and repose in the sleep of peace; the souls of our parents, relations, and friends; of those, who, when living, were members of this congregation, and particularly of such as are lately deceased; of all benefactors, who, by their donations, or legacies to this church, witnessed their zeal for the decency of divine worship, and proved their claim to our grateful and charitable remembrance." That this "grateful and charitable remembrance," as explained by the priests, consists of prayers and masses of the church for the repose of the souls of the departed; and that these prayers and masses will relieve or mitigate the pains of purgatory. That it is true, as stated in the book above quoted (in page 185, § 5), "that Catholics" of the Roman church, "hold that such souls, so detained in purgatory, being the living members of Jesus Christ, are relieved by the prayers and suffrages of their fellow members here on earth; but where this place is, or of what nature or quality the pains are, how long souls may be there detained, in what manner the suffrages, made in their behalf, are applied; whether by satisfaction, or intercession, &c., are questions which do not appertain to faith." That it is no article of faith, that indulgences can be purchased: nor that the prayers of the church will relieve a soul from purgatory; and that she was, therefore, under a delusion. There is no evidence that the priests taught the testatrix any other doctrine, upon this subject, than that which is stated in the book above cited, as the general doctrine of the church. Whether that doctrine be true or false, this court has no jurisdiction to decide. If it was a delusion, it was a delusion common to all the members of that church, and would equally avoid the will of every Roman Catholic who should bequeathe, or had bequeathed, a legacy for masses for the repose of his soul. This court, therefore, cannot say that the will was made under undue influence or delusion.

The third ground of caveat, stated in the record, is, that the bequests and devises, in the will mentioned, or many of them, cannot be carried into effect, and are null and void. This objection involved questions, of which the orphans' court had no jurisdiction, and which this court cannot decide, upon this appeal, which is only as to the validity of the will as an instrument.

The sentence of the orphans' court, that the will be admitted to probate, is affirmed with costs.

THRUSTON, J., absent.